In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-24-00249-CR

ELIJAH JACQUEL GUILLORY, Appellant

V.

THE STATE OF TEXAS, Appellee

**On Appeal from the Criminal District Court**
**Jefferson County, Texas**
**Trial Cause No. F21-38695**

## MEMORANDUM OPINION

Appellant Elijah Jacquel Guillory challenges his conviction for murder. *See* Tex. Penal Code Ann. § 19.02. In his sole issue, Guillory complains there is insufficient evidence to support his conviction based on uncorroborated accomplice testimony. We affirm the trial court's judgment.

1

## Background

In November 2021, a grand jury indicted Guillory for murder, alleging he

> committed an offense hereafter styled the primary offense, on or about the 25TH day of AUGUST, TWO THOUSAND AND TWENTY-ONE, and anterior to the presentment of this indictment in the County of Jefferson and State of Texas, did then and there intentionally and knowingly cause the death of an individual, namely: [MACK DAVIS], hereafter styled the Complainant, by shooting Complainant with a deadly weapon, to-wit: a firearm.[1]

**Jose Martinez**

Jose Martinez testified that he lived in the same neighborhood as the victim, Mack Davis. On August 25, 2021, around 11 p.m., Martinez was watching television in his house when he heard four gunshots. Martinez stated he did not "quickly" go outside, because "it's normal to hear things[,]" such as gunshots on a regular basis. After about "four or five minutes[,]" Martinez went outside and did not see anyone or anything. But he heard someone calling for help, and he called 911. The police arrived shortly afterwards, because someone had already called 911. Martinez checked his security system and gave the footage to law enforcement. A copy of the surveillance footage was admitted at trial. According to Martinez, the footage was taken on the side of his house by the carport; a gunshot can be heard on the footage,

---

[1]Because the Texas Constitution grants crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process[,]" we use a fictitious name to identify the individual identified in the record as the victim of the crime alleged. *See* Tex. Const. art. I, § 30(a)(1).

and two individuals are seen walking. Martinez did not know the individuals on the video.

**Carolyn Lewis**

Carolyn Lewis stated that she is employed at Beaumont Police Department's 911 Center. Lewis described the process of receiving and recording a 911 call in the center. A copy of the 911 call made on August 25, 2021, was admitted at trial without objection and was played for the jury.

**Sheldon Reid**

Sheldon Reid testified that he is currently a police officer with the Sour Lake Police Department, but in 2021 he was employed as an officer with the Beaumont Police Department. On August 25, 2021, Reid was dispatched to the victim's residence around 11:30 p.m. regarding a shooting. A copy of Reid's body camera was admitted and played for the jury. When he arrived, the area around the house was "dark[,]" with several vehicles in the yard, and he found a man lying on the ground yelling for help, later identified as James Dalton. He described the scene as "very high stress." The victim on the ground had a gunshot wound and told Reid that the shooter was in the house. The man in the yard was transported to the hospital. According to Reid, Dalton was talkative, coherent and in a lot of pain. Dalton insisted that Davis shot him. Dalton had been at Davis's home working outside when, according to Dalton, Davis shot him and ran back into the residence. Reid

3

stated that a neighbor told law enforcement there were possibly twelve gunshots, but information was limited because the neighbor was uncooperative.

**Matthew Balsizer**

Matthew Balsizer testified that he is a patrol officer with the Beaumont Police Department. On August 25, 2021, Balsizer was dispatched to a shooting at Davis's house around 11:15 p.m. When he arrived, several patrol units were already there. He observed Dalton and stated that he was conscious with gunshot wounds. Balsizer's body camera footage was admitted without objection. Balsizer assisted in helping Dalton and later returned to the scene. According to Balsizer, Dalton told him that Davis shot him with a .357.

**Lyndsie Breaux**

Lyndsie Breaux testified that she works as an ID technician for the Beaumont Police Department. Breaux described the job duties of an ID technician and stated that she was called to assist with a homicide on August 25, 2021. According to Breaux, she assisted another ID Technician at the scene and helped process for fingerprints throughout the house. Breaux testified about each place in the house that she processed and stated that she was able to lift latent prints from several places in the home. According to Breaux, two prints matched Davis, but they did not match the appellant or his codefendant.

**Deanna Wiltz**

Deanna Wiltz testified that she is a patrol officer with the Beaumont Police Department. She was dispatched to the hospital on August 25, 2021, to speak to Dalton. A copy of Wiltz's body camera footage was admitted at trial. Based on the information obtained at the hospital, Wiltz believed that Davis shot Dalton, then Davis shot himself. According to Dalton, he was attempting to help Davis get through rough times after his wife left him. Dalton stated that Davis became highly agitated, screaming obscenities, and Dalton saw the muzzle flash when he was walking towards Davis. He told Wiltz that Davis went back into the house, through the garage, and Dalton could hear him moving around. According to Wiltz, Dalton did not appear to be mistaken, and he believed that Davis would return and try to kill him. Wiltz stated she never went to the scene.

**Carol Hargroder**

Carol Hargroder testified that she works as an ID technician with the Beaumont Police Department. She stated she was called to process the scene on August 25, 2021, regarding a shooting and two victims. Hargroder described her processes when she arrives on a scene including tagging potential evidence and taking extensive photographs of the inside and outside of the house. Copies of her photographs were admitted at trial. A gun was found at the scene with five live rounds. Photographs of the home were admitted including a picture of a dead dog

with a bullet hole in his head. According to Hargroder, the bedroom of the home was "ransacked, and there was stuff thrown everywhere." In the bedroom was a mirror with writing, a box of plastic bags on the dresser, hemp wraps, little baggies, and cutting tools. Hargroder testified this could signify potential drug dealing, but she did not find any drugs at the residence. Several bullet shell casings were found on the scene including 9-millimeter casings by the dog bed in the house, by a tree outside, around the motorcycle Dalton was working on outside, and by Davis's body. Hargroder testified they found only 9-millimeter casings at the scene.

On September 23, 2021, a search warrant was served on 2065 Ives Street in Beaumont. Hargroder stated that she documented what was found in that home, and her pictures were admitted without objection. Several guns were found at the home, including an AR-15 and a 9-millimeter. After the search, the collected evidence was taken and processed. Law enforcement could not get any fingerprints from the objects collected.

**Erik Kvarme**

Erik Kvarme testified that he currently works as a sergeant in the Crime Scene Unit for the Beaumont Police Department. On August 25, 2021, he was the supervisor of the First Watch Patrol Division, and around 11:30 p.m., he was dispatched to Davis's residence. He described the scene when he arrived as "organized chaos," which is standard in a scene with multiple victims and suspects

still at large. Kvarme described his process of securing the scene and helping the victims. A copy of his body camera footage was admitted into evidence.

**James Dalton**

James Dalton testified that he was shot at Davis's home on August 25, 2021, and left paralyzed from the chest down. That night he was there working on Davis's motorcycle. Dalton stated that he and Davis were "[r]iding buddies[,]" and that Davis was a "heck of a mechanic." Davis would fix things up and sell them. According to Dalton, Davis was not a gun enthusiast and did not normally have guns in the house. That night, Davis had a .357 revolver and an assault rifle in his home.

That night, Dalton had been at Davis's home for "about an hour, maybe two hours[,]" getting their motorcycles ready to ride the next day. Dalton recalled that Davis's wife and child had moved out about a month prior and described Davis as "doing his day-to[-]day things, but he was very depressed." That night, he testified that it was "dead quiet[,]" with the only light coming from the garage, and he "heard something -- somebody cussing, and I turned to my left; and I saw this big muzzle flash." At that point, Dalton assumed that Davis shot him because it was dark and he just saw a "white flash[.]" Dalton testified that he was shot in the abdomen and spine, right by his motorcycle. Dalton recalled trying to move under a truck, and that he "heard people." He heard the people go into the house, heard another gunshot go off, observed "somebody trying to skirmish to the house and stuff[,]" and

7

subsequently coming out of the garage. He then heard the people go into an abandoned house across the street. Dalton testified that Davis did not have a beef with anyone that would come to his home and do that to him. Dalton testified that although he told law enforcement that Davis shot him that night, he said "I wasn't thinking real clear[,]" and he "was confused. I'd been -- you know, I had lost a lot of blood and, you know, there was a lot of things[.]"

**Rachel Davis**

Rachel Davis testified that Davis was her only son.[2] She testified about his separation from his wife, stating that he was "not good[,]" but denied he was suicidal. According to Rachel, her son had a gun, but "[h]e didn't like them at all." Rachel recalled that her son had two guns before his death and identified the guns in court. She testified that she and her husband are gun enthusiasts, and she took pictures of the guns in his house to show their friends. She identified a photograph she signed on October 13, 2021, stating the weapon found in the home at 2065 Ives Street, was Davis's gun.

**Tommy J. Brown**

Tommy J. Brown testified that he is a retired forensic pathologist and described his educational and professional background. He stated that he did not

---

[2]Since the victim and his mother share the same last name, we refer to his mother by her first name.

8

perform Davis's autopsy, but he reviewed the autopsy and photographs. Brown confirmed based on the autopsy that Davis died by a gunshot wound to the head, and his manner of death was homicide. Brown testified that based on the injury there was no way Davis died by suicide, because Davis would have had to hold the gun at least two feet away and angle it at the back of his head. Brown explained that although Davis had a high level of methamphetamine and amphetamines in his system at the time of death, it was not the cause of death, but acknowledged the narcotics could cause paranoia, aggression or make the user suspicious of others.

**Jesus Tamayo**

Jesus Tamayo testified that he is a detective sergeant assigned to the Criminal Investigation Division in the Persons Crime Unit with the Beaumont Police Department. On August 25, 2021, he received a call from his lieutenant to investigate a double shooting. That investigation was handed off to another detective, but Tamayo participated in the search at 2065 Ives Street in September 2021. He explained that the search was prompted by the arrest of a suspect in the attic and items an officer observed in plain view that might be from the crime or taken from the crime. In their search, the officers found a pistol and a "long gun rifle [] weapon." He confirmed Hargroder collected evidence from the scene including the two guns he identified. He stated that he believed the gun found at the Ives Street address could fire the ammunition found at Davis's home.

9

**Joshua Beard**

Joshua Beard testified that he is a police officer with the Beaumont Police Department. On August 25, 2021, he was called to Davis's residence because he is on SWAT, and they "were preparing to enter the home to find out if anybody else was injured or deceased or if the actor was still on scene." According to Beard, no one knew what was going on at the scene, or whether any suspects remained in the house. The officers first attempted to enter the home but stopped when they observed shell casings and a deceased animal in the home. They next sent a robot into the home to clear it before the officers again made entry into the home. Beard testified that the scene did not match the story he was being told about what happened that night. "It just did not make sense that he would come out, shoot somebody, leave them alive, then shoot his own animals, and then shoot himself. [] He didn't have a weapon on him, either." Beard testified regarding the differences in an AR pistol and an AR rifle and that it is possible for an AR pistol to fire .223 caliber ammunition, but he confirmed the only ammunition found at the scene was 9-millimeter.

**Jaymon Mercier**

Jaymon Mercier testified that he is currently incarcerated for Davis's murder and for aggravated robbery. Mercier testified that at the time of the murder, he was a minor and sentenced in juvenile court. Mercier identified Guillory in court.

According to Mercier, he met Guillory through his brother, Jacoby.[3] He confirmed that Jacoby is currently incarcerated for robbery. Mercier testified that he and Davis were neighbors and that he had previously met Davis when he "used to fix my go-cart and stuff." He stated that he knew Davis for a few years and that he was always a nice person.

On August 25, 2021, Mercier met Guillory in front of Mercier's home after dark. Guillory asked Mercier to go "[h]it a lick[,]" which Mercier said meant to "go rob somebody." Mercier said that he did not want to go, but Guillory "pulled a gun on me." He identified the gun as a "Beretta 9[,]" and noted that is what Guillory claimed the gun was. Mercier denied having a weapon that night. They headed to Davis's home, which he described as "[n]ot a far walk, couple houses down[,]" from his home. Mercier confirmed that security footage of two individuals walking that night showed him and Guillory. The security video was played in court, and Mercier stated that he was carrying a duffle bag, then he stopped in some bushes, but Guillory kept going and shot Davis. Mercier stated he was scared and did not expect that Guillory would do that. Mercier testified that he did not see who Guillory was shooting because he was hiding behind a bush. He described the scene when he walked up, stating that Davis was on the ground in front of a truck he was working

---

[3]We refer to his brother by his first name since Jaymon and Jacoby share the same last name.

on, and Dalton was near Davis, "Making a noise like he was unconscious, and he was saying, 'I love you, [Davis].'" Mercier and Guillory then went into the house, where Guillory called Davis's dog over to him and shot him. Guillory and Mercier then split up and went into different rooms. He testified that Guillory was "raiding" Davis's bedroom and came out with an "AR style pistol." He identified the gun found in the Ives Street search as the same gun Guillory took from Davis's home. Mercier denied ever touching the weapon that Guillory took from Davis. After taking the weapon, they both then "left out the back door." They then went to Guillory's home on Ives Street. He testified they stayed at the home for "a little bit[]" to make sure they were in the clear. Then Guillory and Mercier went to a friend's apartment where they stayed for the rest of the night.

According to Mercier, he and Guillory communicated via social media.[4] Copies of the messages between Guillory and Mercier were admitted at trial. The first messages between Guillory and Mercier start August 15th, ten days before Davis's murder. On August 27, 2021, two days after Davis was killed, Guillory and Mercier exchanged the following messages.

Mercier: Wassup[.]

Guillory: You good brudda[.]

---

[4]Screenshots of Guillory's alleged social media account show his name "elijah guillory[,]" social media name "rasta_man.foreign[,]" that he has "139 followers" and "4 posts[,]" and that Mercier and Guillory both "follow" the same eighteen people.

Mercier: hy way[.] theyt (sic) got a li video but u cant even tell its us[.] nd u can hear the gun shots in it[.]

Guillory: On hood I seen it[.] We good brudda keep it to yourself[.]

In the subsequent week, Guillory and Mercier continued to message each other and discussed that law enforcement was looking for them. Guillory also sent Mercier a message that stated, "Be careful lil bro them laws hot then a bitch don't go crashing out[,]" and a screenshot of a news story about law enforcement investigating over thirty auto burglaries. The messages showed that Mercier was trying to go back to Davis's home after the murder to steal his dirt bike, and Guillory told him he wanted the dirt bike too. Guillory also admitted in the messages that he still had the gun stolen from Davis's home.

On cross-examination Mercier continued to elaborate on the events that night, testifying that on August 25, 2021, he was at his grandmother's house for a "get together" and that Guillory was "walking by" that night and wanted to rob someone that night. He denied his older brother Jacoby was there that night. He and Guillory then left his grandmother's home, went to Mercier's house and decided to go rob Davis after 11 p.m. Mercier confirmed again that he went with Guillory to Davis's home and waited in the bushes until he heard gunshots then went into Davis's home. Although he intended to rob Davis, Mercier took nothing from his home and could not explain why he did not take anything, other than to testify they were looking for

13

guns. Mercier stated he did not know what Guillory did with the gun he took from Davis's home.

**Timothy Spikes**

Timothy Spikes testified that he has been employed with the Beaumont Police Department for over twenty years and that although he is currently in patrol, in 2021 he was "an investigator in the criminal unit in persons, which investigates homicides and all aggravated offenses." Spikes was called out to the scene on August 25, 2021. Spikes testified there was "[a] lot of chaos that night[,]" and that when he arrived, Dalton had already been taken to the hospital. He learned that Dalton told law enforcement that Davis had shot him. At this point, officers suspected this was a "murder/suicide situation[.]" He did not find a weapon around Davis and began to suspect that this was a homicide and that other people were involved. Spike testified that the "ID unit" arrived and processed the home. Spikes noted the house was "disturbed[,] [with] [a] lot of drawers and bed mattresses was flipped over. So, at that point I was thinking it was a robbery/homicide at that point." Spikes then went to other homes in the neighborhood and located surveillance video from that night, which was played for the jury. He stated two individuals appeared in the video, one taller than the other and one shorter with a noticeable limp, which he testified would be important later in the investigation. The video shows the shorter person standing next to a bush or tree and the other person disappearing. Four gunshots can then be

14

heard on the video. According to Spikes, Davis was shot once in the back of the head, and Dalton was shot three times. Later, another gunshot can be heard which he states was Davis's dog being shot.

Law enforcement could not identify the individuals in the video, so they sent copies of the video to various news stations in Beaumont. Later, Davis's wife identified the individual with the limp as Jaymon Mercier and told law enforcement the other person could be Mercier's brother. After her identification, Spikes later had an interaction with Mercier and told Mercier he recognized his walk. After the possible identification, Mercier was detained for a warrant, and he agreed to speak to law enforcement. After being presented to a magistrate and told his rights, Mercier told Spikes "the whole story about what happened." Mercier wrote Guillory's name on a pad and told them he was scared because Guillory had threatened his life.

Once officers had a name, they ran Guillory's name in the system, found out he had warrants and located Guillory in the attic at this residence on Ives Street. When Guillory was arrested, law enforcement observed in plain view weapons they believed were involved in the homicide and obtained a search warrant for his home. The gun located at Guillory's home was identified as Davis's gun. Spikes testified that they could not verify Guillory's story. "Once interviewing Jaymon, we corroborated all the evidence that he -- all the information he showed us. Everything

he told us corroborated the evidence we had seen. After interviewing Mr. Guillory, nothing he told us added up to what we had at the scene."

On cross-examination, Spikes confirmed that Mercier and his brother Jacoby had "committed a couple of crimes[,]" in their neighborhood. Spikes testified that although Davis's wife believed the other person in the video was Jacoby, no one else did. He stated the two brothers had a reputation around the neighborhood, and Jacoby had returned stolen bikes to Davis in the past. Spikes testified law enforcement never recovered any clothes that matched the description of what Mercier described that night. The weapon found in Guillory's home and the shell casings at the scene did not match. Spikes acknowledged that Mercier identified the gun that night as a Beretta, but he stated "he's 15 years old. He has no knowledge of what type of weapon is used." According to Spikes, Mercier never told them he went to Guillory's house after the shooting or that Guillory's mother took them to another location. Guillory later told Spikes he bought Davis's gun from Mercier. Spikes denied that he only had the guns to link Guillory to the crime, testifying

> I have a lot of other things as far as the text messages, him talking about the demon in him, that he wanted to do it more. It's a lot of other things that would link him. He actually went by the house the next night to -- to say the lights were on. So, he's been by that house and been inside that house.

According to Spikes, they had a search warrant for Mercier's phone and confirmed the messages were from Guillory based on what Mercier told them.

16

**Tasha Idlebird**

Tasha Idlebird testified for the defense. Idlebird stated Guillory is her son, and she has three other children. In August 2021, Guillory lived at her home on Ives Street. At that time, Guillory, his girlfriend, his child, Idlebird's two other children, and her father lived at the home. On August 25, 2021, Idlebird was working and returned home around 10 p.m. She recalled that Guillory's wife was working, and Guillory was watching their baby. Guillory's wife returned home around 10:30 p.m., then she and Idlebird left around 11:30 to get everyone food. They returned after midnight and according to Idlebird, no one else was in the house at that time. Idlebird stated that she went to sleep around 2 a.m., and she would have known if anyone had arrived at her home. She also denied driving anyone that night. Idlebird testified that she did not tell the police about that night, "They really didn't ask. I didn't really talk to them. Nobody never called me." On cross-examination, Idlebird denied that Guillory was hiding in her attic when he was arrested at her home.

**Elijah Guillory**

Guillory testified in his own defense. Guillory confirmed at the time of his arrest, he was on probation for two burglaries of a habitation and that as a term of his probation, he was to wear a GPS monitor. He stated he cut the monitor off in May 2021, because of a "drug relapse." Guillory testified that he "knew of" Mercier and Jacoby because he went to school with Jacoby, and the brothers lived "not

necessarily the same neighborhood, but a couple blocks away." He denied ever hanging out with them. That night, he was at home taking care of his sick child while his pregnant wife was at work. He testified that his wife is a "high risk diabetic." That night his mother returned to the house around 10 p.m. that evening and his wife around "11:00 or 12:00." His mom and wife then went to get food. He ate his food and testified that he never left the house that night. He denied that Mercier ever came to his house that night. Guillory stated he purchased the gun found in his house from Jaymon and Jacoby Mercier. He denied hiding in the attic when he was arrested. He denied the messages with Mercier were from him and or that it was his phone. He denied having a blue mechanic suit identified by Mercier and stated the police did not find a duffle bag in his home. According to Guillory, "I didn't have nothing to do with it. I have no knowledge of it whatsoever, and I really didn't know what was going on. All I know was they came and got me for my probation violation, and I surrendered myself that day."

**Video evidence admitted at trial**

Several volumes of video footage were admitted at trial, including hospital footage of Dalton, surveillance camera footage showing two people walking towards Davis's home, 911 call from that night, and several different body camera videos from that night at Davis's home.

At the conclusion of trial, the jury convicted Guillory of murder, and after a separate trial on punishment, sentenced him to ninety-nine years of incarceration in the Texas Department of Criminal Justice. Guillory timely filed this appeal.

## The Sufficiency of the Evidence

In his sole issue, Guillory challenges the sufficiency of the evidence to support his conviction for murder. Guillory argues that there was insufficient evidence to corroborate the accomplice witness testimony of Mercier.

## Standard of Review

The jury is the exclusive judge of the credibility of the evidence and the weight to be given to that evidence. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). As such, the jury is responsible for resolving conflicts in the testimony, is free to believe some, all or none of a witness's testimony, and may assign as much or as little weight to a witness's testimony as it sees fit. *Id*. Jurors may also draw reasonable inferences from the evidence. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Id*. at 16.

When examining whether a criminal conviction is supported by legally sufficient evidence, we compare the evidence to the elements of the offense as defined by a hypothetically correct charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). We consider all the evidence, viewed in the light most

favorable to the verdict, along with the inferences that could reasonably be drawn from the evidence. *Hooper*, 214 S.W.3d at 13. We do not assess the credibility of the evidence, reweigh the evidence, nor substitute our judgment for that of the jury. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

The evidence is legally sufficient to support the conviction if any rational trier of fact could have found each of the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted); *see also Garcia v. State*, 667 S.W.3d 756, 761-62 (Tex. Crim. App. 2023) (citation omitted) ("A proper review of evidentiary sufficiency considers the cumulative force of the evidence.").

A defendant commits the offense of murder if he "intentionally or knowingly causes the death of an individual[.]" Tex. Penal Code Ann. § 19.02(b)(1). The indictment alleged that Guillory "intentionally and knowingly cause[d] the death of . . . [Mack Davis], . . . by shooting [him] with a deadly weapon, to-wit: a firearm[.]" Article 38.14 of the Texas Code of Criminal Procedure provides that a defendant cannot be convicted of an offense upon the testimony of an accomplice witness without other corroborating evidence tending to connect the defendant to the offense

20

committed. Tex. Code Crim. Proc. Ann. art. 38.14. When conducting a sufficiency review of the non-accomplice evidence under article 38.14, we eliminate the accomplice testimony and examine the remaining portions to determine whether there is any evidence that tends to connect the defendant to the commission of the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011); *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). "The direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense." *Smith*, 332 S.W.3d at 442 (citation omitted); *see also Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009). No particular amount of corroborating evidence is required for sufficiency purposes. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008).

"'Tendency to connect' rather than rational sufficiency is the standard[;] the corroborating evidence need not be sufficient by itself to establish guilt." *Solomon*, 49 S.W.3d at 361 (citation omitted). The corroborating evidence need not directly link the defendant to the commission of the crime. *Vafaiyan v. State*, 279 S.W.3d 374, 385 (Tex. App.—Fort Worth 2008, pet. ref'd). There simply needs to be other evidence tending to connect the defendant to the crime. *Id*. When there are conflicting views of the evidence, we defer to the factfinder's resolution of the evidence. *Smith*, 332 S.W.3d at 442; *Simmons*, 282 S.W.3d at 508.

21

The non-accomplice evidence that tends to connect Guillory with Davis's murder includes

1. Finding Davis's weapon at Guillory's home after the murder.

2. Dalton's testimony that he heard multiple people go into the home after he was shot.

3. The bullet casings found at the scene did not match the victim's firearms.

4. Surveillance video showed two individuals walking toward the home matching Mercier's testimony of the events that night.

5. The social media discussions between Guillory and Mercier, which started ten days before the murder and continued after Davis was murdered, including messages to Mercier "We good brudda keep it to yourself".

6. Testimony from the forensic pathologist that Davis did not die by suicide.

7. When Guillory was arrested, he was found hiding in the attic.

Conflicting testimony by Guillory that he did not know Mercier well, that the social media account was not his account, and that he bought the gun found at his home from Jaymon and Jacoby Mercier, or by his mother that he was with her the entire night could be discounted by the jury as the factfinder. The jury also had the opportunity to view the video surveillance footage that night, as well as photographs and other evidence at trial, and to observe Guillory at trial. *See Jackson*, 443 U.S. at 326 (explaining that if the record supports conflicting inferences, we must presume that the fact finder resolved the conflicts in favor of the prosecution and defer to that

determination); *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015) (citing *Hooper*, 214 S.W.3d at 13) (other citations omitted) ("Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.").

We conclude that a rational juror could have found that the non-accomplice evidence sufficiently tends to connect Guillory to the murder. *See Smith*, 332 S.W.3d at 442; *Simmons*, 282 S.W.3d at 508; *Solomon*, 49 S.W.3d at 361-62; *see also* Tex. Code Crim. Proc. Ann. art. 38.14. We also conclude that the evidence is sufficient to support Guillory's conviction of murder. *See Jackson*, 443 U.S. at 319; *Hooper*, 214 S.W.3d at 13. We overrule Guillory's sole issue. Having overruled Guillory's sole issue, we affirm the trial court's judgment.

AFFIRMED.

KENT CHAMBERS
Justice

Submitted on March 12, 2026
Opinion Delivered August 5, 2026
Do Not Publish

Before Golemon, C.J., Wright and Chambers, JJ.